Thank you, Your Honors. My name is Mark Nurheim, and I'm the attorney for Mr. Bakhodir Amanov. I'd like to reserve, if I could, three minutes for rebuttal. The first thing I'd like to address is that just given that we have been allocated only ten minutes, I'm assuming that the Court at this time is not particularly interested in the detailed briefs. Because we are so prepared on these cases, and we see a ton of immigration cases, so I think we're familiar with the law and the issues. Sure. So, I mean, for us that's still a continuing issue, but I want to make sure that's preserved in what we've raised here. I think that the crucial issue here is whether, independent of that issue, our client was credible and the impact that the corroboration requirements of the Real ID Act apply. For us it's fairly troubling, because when the immigration judge made his decision in 2006, he expressly said that he found that he could not articulate an adverse credibility finding that might pass Ninth Circuit standards. And then the BIA seemed to try to shift that, at least to interpret it. I'm not sure shift, but I think what I read they did was that he found he could not determine whether the respondent's testimony was credible, which is one of the bases under Real ID for asking for further corroboration. But that wasn't actually what the immigration judge said. Well, but he didn't say, he said he could not make an explicit adverse credibility finding. And our case law before Real ID was you couldn't go ask for corroboration unless there was specific finding, more or less. And Real ID clearly changed that standard. So I'm not sure how much traction we get out of trying to parse the language. Well, the only comment that I would have on that is that he made that decision, I think, in 2006, which is after the 2005 decisions, which I thought I had marked down here. Yeah. No, I understand. I understand the problem. So that's kind of, that's one of the issues. But I'm a little confused because the Real ID act corroboration provision says that even if the evidence is credible, he could still ask for additional evidence. Now, I have a hard time getting my mind around that because if you believe him, you believe him. But apparently that's not the understanding here. So it appears that even if he found that he was, even if he surmised from the fact that he couldn't make an adverse credibility finding that he was credible, he could still request the corroboration and then deny on the ground of not meeting a burden of proof anyway. I think that's essentially what the government's position is. What other position? What else does the new Real ID act mean? Well, a very recent decision, Shrestha, which the government provided as an additional citation, which is 590 F 3rd 1034, which was in January of 2010. The analysis in there says that under Ninth Circuit law, that those kinds of corroboration cases must be reviewed under the totality of the circumstances and that elements that they're trying to get at is things that the immigration judge would have observed directly. Things like demeanor, candor, responsiveness, inherent plausibility, internal consistency, and consistency with other evidence. That decision actually, specific language in there says that the IJ or the BIA cannot cherry pick the facts solely favoring an adverse credibility determination. They can't search for ways to undermine that. That wasn't what I asked you. What I asked you was that under the Real ID Act, as I understand it, there may be other requirements, procedural requirements, but substantively, if the corroboration is done properly, it appears that even if he is, this is what it says, even if he is completely credible, they can still ask for corroboration and find that he hasn't met his burden of proof. Is that not true? That is true that they say that they can do that. I mean, our position is that that's very, in part anyway, that that decision is hard to construct in trying to apply the law to the cases and the facts presented to a court. Well, in this case, I'm not sure why it's so hard to construct. The IJ said he couldn't make an adverse credibility finding that would satisfy the Ninth Circuit, but he or she was quite clear that he was troubled by your client's story. So he was looking for birth certificate, as I understand it, medical information, something from the families to corroborate. And then your client came up with the two medical reports, which the BI looked at and said even at best what those would show is that he was beaten by two strangers. And so that's the record that we have. What is it we're grappling with? What we're grappling with is that in the case of someone who's an asylum applicant, he specifically stated on the record that his family had moved, they were no longer in the country, that it was hard for him to get materials in there because he was already considered to be a quasi-suspect by the police after he filed his police reports regarding the beating, that it was very hard to get the hospital records out. And he eventually did get those. And the judges specifically had said those would be probative of issues. And then the BIA essentially dismissed him when he was finally able to get them and just said, well, you know, they only say he was beaten by strangers. And that doesn't make a lot of sense. There I have a problem because corroboration means it corroborated something. It may not have corroborated the reason, but it corroborated that it happened. And our concern is that the evidence that was submitted does show, I mean if you compared it to what you would get from a U.S. hospital report, do you really believe that a U.S. hospital medical report would say, oh, yes, this person was, he came into the hospital because he had severe concussive injuries and he was injured by Joe Blow or Harry Jones or whoever you want to mention. Would you expect to see that in a medical report? We suggest no. And that's why the BIA just says, well, all it says is strangers. It's hard to say exactly what it says. Well, but they also said that, I mean, let's put that aside because that doesn't make sense to me. But they also said that it wasn't previously unavailable in that the IJ had not regarded his testimony as to why it was not available as convincing and the BIA upheld that. So the two kind of collapse into each other because if you think that it was available at the beginning, then there was no reason to reopen because it wasn't previously unavailable. So that's really the question. Well, yes, but Shrestha, the Shrestha case talks about another alien who failed to provide corroboration evidence. And there's a major distinction between Shrestha and our client. Our client gave detailed testimony. Our client was responsible. But what would be helpful to me is if you address the finding that it was available earlier. That seems to be the key finding here. Well, the issue that we've tried to say before is that he made efforts. He made efforts to try to get that information. And when he got it, as soon as we got it and had it available, we filed a motion to reopen. And that motion to reopen was just the materials that were supporting that were just simply forwarded to the BIA. And he made efforts. And he describes, you know, the problems that he'd had before. What I was trying to say is in Shrestha's case. I know that this concerns me because the procedures for this whole new process concern me. In this instance, as I understand it, the trial, the IJ continued the hearing once, more than once, specifically so he could get corroborating evidence. Is that so or not? Yes, he did in part, yes. And he did attempt to do it. And he responded to the Did he say what corroborating evidence or just generally corroborating evidence? Some of it he wanted. He said that he thought that I think his recapitulation later on was that he thought that it would have been helpful if they had some letters from the family and also if they could have gotten the medical records about the beatings. So you think he had notice of that in advance? Yes, he had notice. But he also was responsive and said, I've tried to get this. He said, I didn't try to get some because it was too expensive. No, he didn't say It was a birth certificate. No, he said in part, if you read the whole context as we've outlined in our brief, he says, it was hard to get, it was hard to mail, his family was out of the country. They were in Kyrgyzstan or Kazakhstan. Your Honor, I have five seconds left. I hope I can get one minute for rebuttal. I'll give you some, but you're ten over already. See, it does count up, right? Okay, thank you. I know, it's terrible. It's not your fault. You'll have a minute. Thank you. May it please the Court, I'm Lyle Jensen from the Department of Justice Civil Division. I represent the respondent this morning. The Real ID Act or the immigration law, in the immigration law, Congress has put the burden of proof on the petitioner to show that he is eligible for asylum. Now, that has two components. It's not just harm, which the medical reports go to. It's also the nexus. You've got to show that it was on account of a reason. The reason that this petitioner, Aminov, stated he was entitled to asylum was that he was persecuted because he was one-quarter Armenian. And it's important to notice where he says it. On his father's side, his father's mother had been an Armenian Christian who converted to Muslim. So, what his position is, is that because I am one-quarter Armenian, with a Russian or Yugoslavian last name, I am considered Armenian, and therefore I am persecuted. Other than his self-service... No, the grade to which he was Armenian isn't... Well, it clearly is because there was no evidence of that. That's a different question, but the fact that it was only a quarter, which seems to be what you're emphasizing, doesn't seem all that important. Well, it is important in that he submitted extensive reports from the country about the human rights situation in Uzbekistan. Not one of those reports states that Armenians are persecuted in any way, but certainly none of them state, and there's no evidence, that someone whose father is half Uzbek, has an Uzbek last name, and is completely Uzbek on the other side, is considered Armenian. There's just nothing there. There's also nothing to verify that any of this is true. His passport, which he submitted into evidence, states that he is an Uzbek. He did not get any... He says, I have a birth certificate that shows my father was Armenian, but he never submitted that. He never submitted a letter or any kind of evidence. He didn't say he had it. He said there was one, and he apparently had seen it, because he described it, but he didn't say he had it. That is correct, but this is an individual who had a year from the time he applied for asylum, represented by counsel. He had two hearings before the final hearing, before the hearing on the marriage, to get the evidence. What is his answer when the judge says, where is this? One part of it is, it was expensive, I didn't know, but the other was, well, I didn't know what type of letters to get. Now, it's not just from the... I didn't understand him to say that. I understood him to say, most particularly, when I was leaving Uzbekistan, I didn't know I was going to need this. That doesn't seem so strange. Then my parents left, so he didn't then say whether... He didn't then explain whether, so they don't have my... Certainly with regard to the medical evidence, so there was nobody there to get it. He doesn't explain with regard to the birth certificate,  or didn't take it with them to Kazakhstan. The expense thing seemed kind of a throwaway, and it's been blown up rather out of the... Primarily he was saying, everybody left and I didn't take it with me. He didn't say everybody left. His brothers were married to Uzbeki women and had Uzbeki children who remained in Uzbekistan. One of the wives allegedly was attacked on the street because she was married to, quote-unquote, an Armenian. She's in Uzbekistan. There's nothing from her to verify any of this. The brothers were out, but the wives were there? I'm sorry, Your Honor. The brothers were out, but the wives were there? The parents were out. The mother and father and his brothers apparently went to Kazakhstan. That's what I thought, but the wives of the two brothers were still there. And their children stayed there. How old were the children? The record does not say. So at best you're suggesting that one of the two wives might have been an agent for getting the birth certificate? Of course. But more than that, she was an agent for at least verifying, yes, I was attacked because Uzbeks claimed that my husband was Armenian. The same way that the brother who's in Kazakhstan, and remember he states that he was in contact with his family in Kazakhstan. He was telephoning them. He was able to reach them. No statement from the brother about the cafe that was allegedly ransacked. No statement from the father. And by the way, the father, who's, if everything is to be believed, is half Armenian. He ran a recycling business in Uzbekistan after Uzbekistan became independent, which is when Aminov says all these problems started. And he ran it successfully until the government shut it down, not because he was Armenian, but because they nationalized the industry and said no one can do this. Now on one hand he says, my father looked very Armenian. On the other he said, but he was able to hide it. On one hand he states, oh, my name was changed to Aminov, which is Russianized, so they wouldn't know. But if you look very carefully at that, that makes no sense. His father's father was Uzbeki. He didn't have to change his last name. He did not have an Armenian name. It was the grandmother who was. We know from what he stated in his affidavit, where he gives his mother's maiden name, that his mother had a different maiden name than Aminov, which means that, like in America, they take the last name of the father. So Aminov was never Russianized from an Armenian name. The Armenian was on a different side. That statement in itself is just totally inconsistent. This is why the immigration judge didn't know what to believe and wanted corroboration. Now, he did provide some corroboration in the medical forms, and we acknowledge that. And that is corroboration of something. It's not corroboration of everything, but it's corroboration of something. It's corroboration that he was beat up. Right. What it's not corroboration of is his claim, is the nexus. Why was I beat up? Because I am one-quarter Armenian. Well, yes, that's true. But if I thought this was determinative, I'd be bothered by it, because the BIA didn't reopen to accept the evidence and therefore didn't evaluate it, nor did the I.J. evaluate it. The I.J. seemed to be saying that he didn't think the whole thing happened at all, and so it could have made some difference to his evaluation. So I don't really understand why that wasn't let in. But two prongs. Now, admittedly, he didn't have it before the I.J. The I.J. is blameless in this. He never saw this evidence. I understand that, but that's because the BIA didn't let it in. No, no, no, no, no. It was submitted to the Board. The Board considered it and said it's not enough to reopen. Why? One, because it's untimely and you haven't shown why it's untimely, why you could not get it before the I.J. in a timely fashion. But two, because your claim rests on your assertion that you're Armenian. You have submitted no evidence, despite the fact that corroboration was readily available in the forms of statements, at the very least, from your family members. You haven't shown that. You haven't shown a nexus. The fact that Uzbekistan has a very poor human rights record, which the government concedes, is not enough, because general strife in a country isn't enough. You have to show a nexus. Why was I persecuted? He's claiming on the Armenian aspect. He's never shown that, and he's never shown that Armenians are persecuted in Uzbekistan, or that people such as himself, whose mother was fully Uzbeki and whose father was half Uzbeki, are considered Armenian. That's where the BIA's decision rests. That's why he needed the corroboration, and he could have provided, he should have provided, in the form at least of statements, but he did not. I am running out of time. I would like to say that I will rest on grief as to the constitutional issues. But we do believe that this Court has spoken clearly, especially in Aden, which is very, it's right on point with here, where there was no adverse credibility determination, and yet they upheld the corroboration. They said, you've got to corroborate. And we point also out. Well, you don't need to corroborate unless you're asked to corroborate, and there are many procedural problems. But this case seems to have, he seems to have had pretty good notice. He did, and he just failed to corroborate. Subject to your further questions, Your Honors, that will conclude my argument. Okay. Thank you. Thank you, Your Honor. Appreciate it. Are there any country reports that show there is this persecution? We submitted several reports that detailed just the massive problems with politics and ethnicity and nationalist movements. There is a very extensive one that we submitted at the time. It was the Department of State report that we, it listed a laundry list of human rights problems in Uzbekistan. That was at pages 36 to 37, our opening brief. And those were from reports that were at the time current, March 8, 2006. That would have been the 2005 report. I wanted to mention a couple of things. Let me just ask real quickly, do you contest that your client had notice that he was going to be obliged to corroborate his claims? We admit, yeah, we contest one part of it. I mean, he did have notice, and he did make the effort, though, to do it. And he was trying to be responsive as best he could. It is true that he never came up with anything that corroborated either his Armenian heritage or the fact that he was persecuted because of it. He was unable to come up with a heritage documentation at the time because his family had gone. I wanted to address a couple of things very quickly that are relevant to these questions. He had gotten a letter from somebody in his family saying this. He didn't get that either. Unfortunately, he was unable to explain that during the hearing. For a while, he wasn't even sure where they were. But he had a year, and he did know where they were, and he was in contact with them. And they weren't in Uzbekistan, so they couldn't claim fear because of that. Kazakhstan. The problem, though, I wanted to make sure, though, is that I wanted to make sure it gets out. His claim wasn't only limited to the Armenian incident. Specifically, if you look at our briefs at page 96, or the administrative record, AR 96, 138, and 138-139, he testified that he was first attacked at a bank by a nationalist group called the Awakening. And they were trying to kick people out that they didn't think were full Uzbekis from bank positions. And then later on, he was attacked subsequent to that. I don't understand what you mean that it wasn't only because he was Armenian. It was also because he was Armenian. Well, in part, but he objected. Well, how's the other part? He called these people fascists during the... He testified that he called them fascists when they were pushing a nationalistic, ethnic-cleansing kind of agenda. And there is evidence in the record about the rise of nationalism. Okay, so I think we... There's a Morgan Liu case, or a Morgan Liu article. Yeah, you cited this to the materials. Judge Snow, you had a question? No, I'm fine. Okay. Thank you very much. Thank you. Case argued is submitted. We thank counsel for the arguments.
judges: Snow, Fisher, Berzon